### COBB v. UNITED STATES.
Civil Action No. 2190.

United States District Court
W. D. Louisiana, Shreveport Division.
Dec. 15, 1948.

See, also, D.C., 74 F.Supp. 713.

D. H. Perkins, Booth, Lockard & Jack, and Whitfield Jack, all of Shreveport, La., for plaintiff.

Malcolm E. Lafargue, U. S. Atty., and W. J. Fleniken, Asst. U. S. Atty., both of Shreveport, La., for defendant.

DAWKINS, Chief Judge.

This suit was filed under the Federal Tort Claims Act of 1946, T. IV, Sec. 402 et seq., Public Laws No. 601, 79th Congress, Ch. 753, Second Session, 28 U.S.C.A. § 2671 et seq., for personal injuries to a 15 year old cadet in a Junior Reserve Officers' unit at Byrd High School in the city of Shreveport.

Defendant denied liability and plead the "loaned servant" doctrine, as well as contributory negligence.

On April 3, 1935, the Caddo Parish School Board applied to the War Department for establishment of "junior units of the Reserve Officers Training Corps" at the two high schools in Shreveport, for the military training of physically fit students, for a maximum period of three years. This application was upon the form provided by the War Department, the third paragraph of which reads as follows:

"3. The authorities of this institution also agree to conform to the regulations of the Secretary of War relating to issue, care, use, safekeeping, and accounting for such government property as may be issued to the institution. Further, the institutional authorities agree to appoint or designate by resolution or in by-laws, whichever may be countenanced by statutes or approved methods of procedure governing the institution, an officer of the institution, to be known as military property custodian, who will be empowered to requisition, receive, store, and account for this property and otherwise transact matters pertaining thereto, for and in behalf of the institution."

At the same time the School Board executed bond, likewise on a printed form, furnished by the War Department, under Section 47 of the National Defense Act of June 3, 1916, as amended by the Act of June 4, 1920, 10 U.S.C.A. § 389, in the sum of $43,000, representing the value of property furnished to it and which bond contained the following condition:

"Now, therefore, if, as to all property of the United States (except uniforms, expendable articles, and supplies expended in operation, maintenance, and instruction) issued or to be issued to said institution under authority of law, not exceeding in value the penal sum of this bond, the said institution shall take good care of, safely keep, and account for the same, and shall, when required by the Secretary of War, return to the War Department all said property so issued and covered by this bond, within thirty days, in good order and condition, reasonable wear excepted, then this obligation shall become inoperative and void; otherwise to remain in full force and virtue."

The application and bond were accepted. The cadet, Clayton A. Cobb, at the time of his injuries on January 28, 1947, had been enrolled at Byrd High School, in the unit, for several months. Lieutenant Colonel Samuel I. Irving, with sergeants Mann, McVoy and Deal, had been assigned to and were teaching military science in the two high schools in the city of Shreveport.

They were members of the faculty of these institutions and the sergeants were each being paid the sum of $15 every four weeks by the School Board for taking care of weapons and doing other work. Some two months after the accident, Cadet, Donald Mize was appointed by the School Board "assistant military property custodian" at a salary of $125 per month.

On the said 28th day of January, 1947, Sergeant Deal called for volunteers to clean machine guns, and young Cobb was among those who responded. The guns had been stored in an armory provided by the School Board, coated with a gummy substance or grease called cosmolene, to protect them against rust and deterioration. On the day in question the guns were taken outside the building and placed in boiling water contained in a half drum (ordinarily used for gasoline, etc.), split lengthwise, and under which a fire was burning, the purpose being to soften the cosmolene and make it easy to remove. When taken out of the water they were put in another vessel of the same kind, some twenty feet away, containing an unheated solvent, to complete the cleaning. The flash point of this solvent was much higher than gasoline (113) but a few degrees below kerosene and had likewise been stored in a drum in the same building. It was drawn off into smaller containers and carried outside by Cobb and the other cadets and poured into half drums used in cleaning the guns. In doing this, according to Cobb, some of the solvent splashed on his trousers. While Sergeant Deal was absent for a few minutes from the place where the guns were being cleaned, Cobb attempted either to place one of the guns into or to take it out of the half drum of boiling water, and in doing so, got too close to the fire, his trousers were ignited, and before it could be extinguished, was severely burned on the legs. There is some dispute in the testimony as to whether Cobb and the other cadets were warned of the nature of the solvent. After volunteering, the boys went to the room where the solvent was stored and put on fatigue suits and prepared to help with the cleaning of the guns. Cobb was late in arriving there and put on his fatigue suit or overalls over his civilian clothes.

The injured cadet testified in substance as follows: Sergeant Deal instructed them to don fatigue suits, and that he, Cobb, having left the class room "a little after the rest, when I got down they had on their fatigues, and I didn't have time to take my other clothes off, so I just put the fatigues on over my other clothes"; that the solvent was in a large barrel or drum from which it was poured into five gallon cans through paper funnels made on the spot from sheets of paper; that in the first attempt to pour it, the solvent was spilled, splashing onto his trousers and over the floor in the storage room; that he carried some of the cans out to and poured the solvent into the half drums used when the guns were taken from the boiling water. At the time his trousers were ignited, he had taken one gun from the boiling water, put it into the solvent and gone back for a second "when I caught on fire." The hot water in the drum came up to about his knees. There was no label on the drum of solvent warning that it was inflammable; neither did Sergeant Deal nor anyone else tell him it was dangerous. He stated, "I did not know that it was inflammable or that it would burn in any way." He admitted that he had been a member of the unit for about six months.

Cadet Donald Mize testified that prior to this accident, he had not helped with cleaning of machine guns. He identified as Exhibit "A" a copy of the wording on the drum of solvent in the storage room, made in his own handwriting, which said nothing about it being inflammable or dangerous. He stated that he helped Deal pour the fluid out of the hole in the top of the drum through a card board funnel and some was spilled on the floor but he did not see any of it spilled on anything else. They took four or five five-gallon cans out to be used in the cleaning, but he did not carry any of it. Cobb carried one can. Twenty-four to thirty machine guns were to be cleaned with it. Otherwise his testimony as to the cleaning of the guns and the way they were handled was substantially the same as that of Cobb. Although the machine guns consisted of two parts (the gun and the bi-pod), the bi-pods were left in the armory and about one-half dozen guns

had been cleaned before the accident happened. Mize also testified that he, Mize, placed some of the guns in and took them out of the one-half drum of boiling water and he believes Cobb did likewise; that some of the boiling water in which the guns with the cosmolene were placed, was splashed on one of the girl. sponsors; that Sergeant Deal had them get some cleaning fluid from the store room to clean her dress and that he, Deal, then told them he "would remove the guns himself, take them out and put them in himself"; that up to that time he, Mize, had placed some guns in and taken them out of the hot water and he believes Cobb had also; he doesn't know whether Cobb was present or if he heard Deal make this statement. At no time did Deal say anything about placing the guns in or taking them out of the boiling water would be dangerous. The fire started about Cobb's ankles, burned up to his waist, and was finally put out with fire extinguisher by Sergeant Mann. He saw no signs or heard anyone "say anything as to the nature of this cleansing fluid"; neither did Deal or anyone else inform the cadets that the fluid was a little more dangerous than kerosene. Further, that no one connected with the school system ever gave "any instructions or directions, or supervision in connection with the R.O.T.C. course"; that the first period of military instructions on the day in question had expired, and of four cadets, Cobb, Melton, Stephenson, and Mize, Melton had to leave and attend another class, leaving the other three, who having no class for the second military period, asked and were told they could remain and continue with the cleaning of the guns. It was during this latter period that Cobb was burned. Two months later this witness, (Mize), was made assistant custodian by the school superintendent at a salary of $125 a month and his duties were "to keep the place clean, keep the weapons clean, uniforms straight and sweep the armory."

Cadet Jerry Stephenson testified that he did not help pour the solvent out of the drum but had helped carry some of the cans outside to be used in the cleaning; that Sergeant Deal and Donald Mize poured the solvent out of the 50 gallon drum cans as Mize had testified, through cardboard funnels, and some of it spilled on the floor; "some splashed on their trouser legs when they were pouring it and when they were carrying it out"; Cobb and Melton carried some of the cans outside; but does not know whether Mize did or not; they filled a one-half drum with water to be heated, taking it from the faucet outside the armory, but did not place any guns in the hot water, and saw only Sergeant Deal do this, and does not remember whether any of the other cadets did or not. He also told the story about the sponsor getting some on her dress, how it was cleaned off, his belief being that it was splashed on her by cadet Mize; asked what did Sergeant Deal say about that, replied, "He got pretty sore about it and he told all of us he would put the guns in and take them out himself." He doesn't know whether Cobb was there or not. He heard no one give any warning as to danger from the solvent.

Stephenson also testified that he had not done this kind of work before, but had only cleaned the rifle which he used individually. Neither had he previously been in detail to clean military weapons with Cobb because the latter was in Company B and he was in Company A. Nothing was said or done to put him, Stephenson, on notice that the cleaning solvent was inflammable. He did not hear Deal warn any of the cadets to stay away from the fire if they had spilled the solvent on their clothes. According to his statements, the water was placed in the half drum, the fire was started under it, and they then brought the solvent out and put it in the other two half drums, some 20 feet distant from the one with the fire under it. He further states that they all went into the building at one time and there was no complaint that they had to carry the guns and solvent such a long distance. They had to wait a good while for the water to get hot. He did not put any of the guns in the hot water himself nor did he see Cobb do so. Sergeant Deal took the guns out of the hot water and brought them over to the drums containing the solvent. When the hot water was splashed on the sponsor's dress, Sergeant Deal told them not to "be fooling with those rifles in the water any more"; that he would do it himself because

he had some other clothes he could use. He does not know whether Cobb was present or not. Cobb caught fire ten or fifteen minutes after the first period had expired. He, Cobb, and Mize had continued helping with the work into the second period because they had no class at that hour.

Charles Melton, another cadet, was there only during the first period and left to attend a class during the second. However, he was present when the hot water was splashed on the sponsor's dress and did not hear what Sergeant Deal said about it. Some of the fluid was splashed on him while being poured out of the drum and some was spilled on his pants while carrying the five gallon cans to the half drums. "It was all over my pants and they were saturated."

On redirect examination Melton testified in part as follows:

"Did you see any signs, labels, or advertising around the place, or on the barrel anywhere, or did you hear any of the R.O. T.C. instructors, or otherwise, say anything at all about this solvent being dangerous, or anything about getting around fire with it?

"Well, there was no label at all on the big drum, but I think it was Mize, Stephenson and I, we all went down there together, and he told us it was inflammable and not to get around the fire with it, but there was no label on the drum whatever.

"Who told you it was dangerous, and not to get around the fire?

"I think it was Sergeant Deal on the way down there.

"On the way down there he told you this stuff would be dangerous and not to get around the fire with it?

"Yes, sir.

"Did you hear what Sergeant Deal had to say when the little girl got splashed?

"No, sir."

Clayton Cobb was recalled and stated, in substance, that he was not present when the sponsor was splashed and heard of it first while in the hospital. He denied that Deal had told them to keep away from the fire and swore, "He was showing us how to put the guns in and take them out and how to turn them over in the water. He

and Don (Mize) put them in and took them out of the water".

Melton was recalled and again stated that on the way down to where the solvent was located, in the building, before they started the work, Deal told them:

"Don't get around the fire with any of that stuff on you. He says 'if you get any on you' he says, 'it is inflammable'. That is all that was said."

After plaintiff closed Sergeant Deal was called and testified as follows:

He acted as instructor at Byrd High School and was in charge of the weapons, for which he received $15 every four weeks from the School Board. No other military man was working with him at the time of the accident, but he and the other three sergeants had done the same kind of work before. When they wanted help from the cadets they asked for volunteers. This compensation was in addition to their salaries from the Government. Asked under whom he worked in teaching military science he replied: "I take my orders from Colonel Irwin." He was in charge of cleaning the machine guns and described what was done as follows:

The half drum with the water in it was placed on four bricks, one at each corner with a fire underneath. It was a 55 gallon drum, which had been split down the middle and was lying on its side. After the half drum was placed on the fire, "Mize and four of the cadets went to the far end of the store room, where we had the 50 gallon drum of cleaning solvent." After the cadets arrived they got two five-gallon cans and started down to the far end of the store room to get the cleaning solvent. He and the four cadets were going along together. On the way down, the cadets were "griping" about having to go so far back there after the solvent and Deal testified that he responded with the statement, "Well," I says, "well, the reason we have to do it is it is inflammable and we can't keep it around the supply room; we have to keep it down here." When they got to the drum containing the solvent it would not pour readily and they improvised a funnel out of manila paper and he fastened it together at the end with a brad, through which the solvent was poured into the cans.

The solvent did splash out and some of it got on the floor. He did not see any of it get on the clothes of the cadets. They were calling it gasoline. "I told them it was not gasoline; that they were not allowed to clean army weapons with gasoline." He stated that the odor was something like kerosene and that it was poured into the two half drums, and he, Deal, took a brush and showed them how to clean the guns with the solvent. "Two of the boys were cleaning the guns after I took them out of the water"; and he indicated later in his testimony that these were Stephenson and Cobb. The guns with all their attachments weighed 32.5 pounds, but the shoulder stock and bi-pod were taken off. He had been on duty at the two high schools since August 18, 1945, and went back to Byrd on January 15, 1947. At the time of this accident he was doing no instructing but looking after the weapons entirely. About fifty per cent of the time he had the cadets help in cleaning the guns. He received $15 every four weeks regardless of what he did. There was only one R.O.T.C., with separate units at each of the high schools, Byrd and Fair Park.

While they were getting the solvent one of the cadets, Stephenson, asked if they could smoke and he, Deal, told him "No." I says that "we will burn the joint up."

He did not know the names of the cadets until after Cobb got burned, but stated that all four of them were there and heard it. Sometimes he would put solvent on the guns and burn the cosmolene off instead of cleaning them in the way they were doing.

On cross examination he states that they were all present when he explained the difference between the solvent and the gasoline. He told them all to stay away from the fire and especially when some of the water had been splashed on the sponsor.

Counsel for plaintiff on cross examination produced an unverified copy of what purported to be a statement by the sergeant made a few days after the accident in which nothing was said about having warned the cadets about the inflammable character of the solvent. After much wrangling between counsel the court ruled that a reasonable time would be given counsel for plaintiff to obtain the original of this statement from the War Department. This was finally done.

During the cross examination of Deal in which the unverified copy of the first statement was used, counsel for the Government produced a statement taken from Deal in June, following the accident in January, which was much longer and went more fully into details as to what happened from the time the cadets volunteered and went to help clean the guns. The latter statement did say that Deal had informed these students of the nature of the liquid in substantially the same manner as testified to by him on the stand. A careful examination of both statements indicates that the first was taken in a manner to inform his superior what had happened rather than to reveal any notice or warning that had been given to the cadets in doing the work. When the second statement was taken the suit had been filed and the issue of carelessness on Deal's part presented, and in taking his and other witnesses' statements, it was but natural to go into this phase of the matter. It is not thought that the production of the first statement served to impeach or seriously reflect upon Deal's testimony.

Clayton Cobb was called in rebuttal and denied that he was present at any of the times when the statements about smoking, the difference between the cleaning solvent and gasoline, and when what was testified to have been said by Deal at the time the liquid was splashed on the sponsor. On the issues of fact a situation is presented that at each of those important instances at which Deal spoke of the nature of this cleaning fluid and its dangers, which are corroborated in considerable measure by the other three cadets, Cobb claims to have been absent or not to have heard them. It is believed that the evidence clearly shows that after Melton left at the end of the first period, he, Cobb, and Stephenson, were assigned to the job of cleaning the guns in the solvent, some 20 feet from the fire, while Mize was taking them from the rack on the outside of the building and giving them to Deal to be placed in the hot water. The splashing had taken place just before Melton had left, and the latter

contends he did not hear the admonition of Deal that none of them should put guns in or take them out of the hot water after the splashing occurred. However, while the others said they had put guns in and taken them out and Deal had shown them how, after this incident, he, in positive terms, directed that they not do so again, and that he would attend to it himself. Their testimony is also consistent with that of Deal, that the latter had gone in to the building at the time Cobb caught fire in handling one of the guns in the hot water. There is no clear explanation of just why he did this in the absence of the sergeant.

In the light of all these circumstances I am constrained to find that the evidence preponderates in favor of the proposition that the sergeant's statements are true, and except for the fact that the others can not swear positively that Cobb was present on these occasions, we have only the statement of Cobb, as it happens, that he was absent at each crucial moment. For these reasons the facts on this score are with the defendant.

█ After a thorough consideration of all the evidence and the nature of the agreement between the School Board and the War Department, by which these army personnel were giving instructions in military science at the high schools in question, I am convinced that the situation is no different to what it had been throughout the years at state universities and colleges over the nation, i. e., where instructors are loaned and assigned from the army, as commandants, to do such teaching when requested by said state institutions. While it is true that the national government in time of war also benefits from this training by having enlistees or draftees, with some military training, the manner in which it has been and is shown by the contract and bond in this case to have been done, by request and agreement, in which the state or institutions take over and become responsible for government property, such as the weapons involved, and agree to provide for their care and safe-keeping, eliminates any liability by the Government for mistakes or negligence on the part of such army personnel.

It is my conclusion, therefore, that these commissioned and non-commissioned officers were, during the time in question, serving at the instance and under the control of the state and its sub-division, the Public School Board. From this it results, that, if Deal was guilty of actual negligence, as to which the evidence points the other way, it was not as an agent of the United States.

█ It is further my view that Cobb was sufficiently mature in understanding and common sense to have appreciated the danger of bringing his clothing, wet with this cleaning fluid, in close proximity to the open flame, as was done in the absence of Deal, and that his action amounted to contributory negligence in bringing about his injury, which bars his recovery.

Proper decree should be presented.